IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2003

## STATE OF TENNESSEE v. RICHARD DILLING

**Direct Appeal from the Circuit Court for Obion County**
**No. 2-275      William B. Acree, Jr., Judge**

_____

**No. W2002-02547-CCA-R3-CD  - Filed November 24, 2003**
_____

Following a bench trial in the Circuit Court of Obion County, Defendant, Richard Dilling, was convicted of misdemeanor reckless endangerment. He was sentenced to serve 11 months and 29 days, with all but 30 days to be suspended. He now appeals, challenging both the sufficiency of the evidence to sustain the conviction and the sentence imposed by the trial court. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Didi Christie, Brownsville, Tennessee, (on appeal); Joseph P. Atnip, District Public Defender; and William K. Randolph, Assistant Public Defender, (at trial) for the appellant, Richard Dilling.

Paul G. Summers, Attorney General & Reporter; Jennifer Bledsoe, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Kevin Alpin, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

On the afternoon of July 20, 2002, Defendant was at the home of his aunt, Sarah Ceiga, located at the Homestead trailer park in Troy, Tennessee. Several other people were also present, including family members. From the record it appears that there was some discord among the members of the family during the immediately preceding 24 to 48 hours. One or more had been taken to jail on unspecified criminal charges, and Ms. Ceiga had been required to arrange bail. Some of those present had congregated at Ms. Ceiga's home because they had been staying at the residence of an individual who was incarcerated, and he had told them to leave. In any event, it is implied from a review of the record that disharmony and disgust among the family members had caused tempers to flare and patience was in short supply.

Ms. Ceiga testified that she told those present in her home that they could stay, but "if they started any stuff," they would have to leave. Ms. Ceiga further stated that Defendant "started with an attitude" and she asked him to leave several times. He would not leave. Ms. Ceiga's husband, David Ceiga, pushed Defendant out the door, but Defendant still would not leave, and kept "coming back" at Ms. Ceiga's husband. She called the police for assistance in forcing Defendant to leave.

Officer Larry Farley and Chief James Cleek of the Troy Police Department responded shortly after Ms. Ceiga's call to the police. They arrived at the Ceiga residence at approximately 2:00 p.m. Farley, Ms. Ceiga's former son-in-law, arrived a few minutes before Chief Cleek. Farley confronted Defendant at the scene and told Defendant that he had to leave. According to Farley, Defendant stated that he did not want to leave, at least until he told his side of the story. Farley again told Defendant to leave, and that he had no desire to hear Defendant's story. Defendant became "a little agitated" and got into his vehicle. According to Officer Farley, Defendant reversed the vehicle at a high rate of speed, left the trailer park "slinging gravel," ran a stop sign, and proceeded down Highway 51 North at a high rate of speed. Chief Cleek and Farley immediately gave chase after Defendant in their respective police cruisers, with Chief Cleek in the lead. Officer Farley testified that at one point he was chasing Defendant at a speed in excess of 80 miles per hour.

Prior to leaving the trailer park, Defendant's friend's six-year-old child had gotten in the backseat of Defendant's vehicle. Defendant testified that he placed the child inside the vehicle before he left, but Farley and Cleek testified that they were unaware that the child was inside Defendant's vehicle until Defendant finally stopped his vehicle on Highway 51.

Farley and Cleek testified that Defendant did not pull over in a normal fashion. Both cruisers had their flashing lights and sirens turned on during the chase. Chief Cleek drove his vehicle even with Defendant, on the passenger side of Defendant's vehicle. According to Farley, Defendant then swerved his vehicle toward Chief Cleek's cruiser, causing Cleek's vehicle to drive off the shoulder of the road. Chief Cleek then passed Defendant, and he was driving in front of Defendant while Farley was driving behind Defendant. Chief Cleek began to slow down to force Defendant to slow down. Suddenly, Defendant "locked down" the brakes on his car, "slung" over to the right side of the roadway, leaving skid marks on the road, and he stopped with his car sideways in the right side of the road. Defendant was then arrested. Chief Cleek's testimony was similar to Officer Farley's testimony, except Cleek did not mention that Defendant had swerved at his vehicle.

Defendant testified that he initially went to the trailer next door to Ms. Ceiga's trailer, to speak with Elizabeth Neace. Neace left and went to the Ceiga residence, and told Defendant to "stay put." Defendant initially stayed, but then went to the Ceiga home and asked to speak with Ms. Neace. Defendant stated that "one thing led to another" and that David Ceiga "assaulted me by force, grabbed my arm, threw me against the trailer, pushed me down the stairs, knocked me down in the gravel."

Defendant testified that Cleek and Farley then arrived and told him to leave. He told them that he did not mind leaving, but he wanted to tell his side of the story. Defendant said that Chief Cleek told him twice that he had one minute to leave. Defendant put the child into the car and backed out. Defendant claimed that he left two or three minutes before Chief Cleek and Officer Farley left the trailer park. This contradicted the police officers' testimony that they immediately began chasing Defendant when he left.

Defendant claimed that he did not see flashing lights or hear sirens. He said he did not know he was being chased by police until Chief Cleek pulled directly in front of him, putting on his brakes, forcing Defendant to slam on the brakes and swerve to the right, leaving skid marks on the road.

Defendant claimed that he left the trailer park at 10 miles per hour, the posted speed limit. He asserted that he drove no faster than 65 miles per hour down Highway 51 North prior to being stopped by Cleek and Farley. Defendant testified that he has family members who reside at Homestead trailer park, that he had visited there often, and that he had never seen a stop sign at the exit he took from the trailer park.

On cross-examination, Defendant stated that the officers' sirens were never turned on, and that he did not see the flashing lights because he was "looking at the child" in the back seat. Defendant testified that Chief Cleek and Officer Farley lied when they testified that the sirens were turned on. He also stated that Ms. Ceiga lied when she testified that she had told Defendant to leave her residence. Defendant denied that he tried to run Chief Cleek off the road, that he had run a stop sign, and that he had "slung" gravel when he left the trailer park.

In announcing its verdict from the bench, the trial court found that Defendant's testimony was "totally impeached" during cross-examination by the prosecutor. The trial court specifically found that Defendant backed out of the trailer park at a very high rate of speed while the young child was with him. Also, the trial court found that Defendant ran the stop sign and proceeded on Highway 51 North at a very high rate of speed, with the police officers following behind him at speeds up to 80 miles per hour. The trial court found that it was necessary for the officers to "box in" Defendant in order to try to get him to stop, and that Defendant then came to an "abrupt stop" in such a manner as to endanger the officers as well as the child in the vehicle with Defendant.

## ANALYSIS

### I. Validity of Defendant's Appeal to Circuit Court from General Sessions Court

We must first address the State's argument on appeal that the trial court lacked the "authority" to determine Defendant's guilt or innocence of reckless endangerment. The case came before the Circuit Court of Obion County following Defendant's appeal from the General Sessions Court of that county, where the charge was initiated in an arrest warrant. Defendant was also charged, as a result of this incident, and convicted in General Sessions Court, of resisting arrest and

disorderly conduct. He appealed those convictions at the same time and the Circuit Court found him not guilty of those two offenses following the trial.

The State argues for the first time on appeal that Defendant pled guilty to all three offenses in the General Sessions Court, and therefore could only appeal the sentences imposed. Tenn. R. Crim. P. 5(c)(1); *see State v. Winebarger*, 70 S.W.3d 99, 100 (Tenn. Crim. App. 2001). The State asserts that the three guilty pleas to reckless endangerment, resisting arrest, and disorderly conduct should be reinstated.

We initially note that the State did not advocate this legal argument in the Circuit Court of Obion County. We also question whether the learned trial judge in this case would conduct a *de novo* bench trial following guilty pleas in the General Sessions Court. The State, on appeal, apparently relies upon the fact that on each of the three arrest warrants, the word "guilty" is circled in the boiler-plate, pre-printed language under the heading "Request to have case tried in General Sessions Court." The pertinent language on each arrest warrant states that "[a]fter being fully advised of my rights by the Judge I submit this case to the jurisdiction of the General Sessions Court, and hereby plead ___ guilty to the offense of [reckless endangerment or Disorderly Conduct or Resisting arrest/stop] . . . ."

While the word "guilty" is circled, it is also important to note that each arrest warrant has pre-printed language listing the litany of rights waived upon a plea of guilty. On this part of the arrest warrant, the spaces for the signatures of Defendant, his attorney, and the General Sessions Judge are blank. This strongly indicates that there were no guilty pleas in General Sessions Court. Furthermore, there is reference to Officer Farley's General Sessions Court testimony in Defendant's testimony during the Circuit Court trial. Finally, there is, in the transcript, a persuasive indication that the trial court, the prosecutor, and the defense attorney were all aware that the appeals were from convictions following a trial in the General Sessions Court. At the beginning of the trial in Circuit Court there is the following colloquy:

OPENING STATEMENTS

[Prosecutor]: I just want to make sure - - we're here on, I believe, three charges that were appealed, reckless endangerment, resisting stop [sic], and disorderly conduct. Is that - -

[Defense counsel]: That's correct.

THE COURT: Let's see - - yeah, you're correct.

While the "judgment" portion of each arrest warrant does not clearly indicate that the fines and sentences were imposed following a trial rather than guilty pleas, and the word "guilty" is circled on a portion of the arrest warrant as indicated above, we are confident from our review of the entire record that Defendant did in fact appeal to the Circuit Court the three convictions which resulted

-4-

from a trial following pleas of "not guilty." The State is not entitled to the relief it seeks on this issue.

## II. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to sustain his conviction of misdemeanor reckless endangerment. A person "who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury" commits the offense of misdemeanor reckless endangerment. Tenn. Code Ann. § 39-13-103 (1997). A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(31) (1997). Tenn. Code Ann. § 39-11-106 provides, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint."

The State is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In determining whether the evidence was sufficient, the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992).

Although this was a bench trial, the findings of the trial judge carry the same weight as a jury verdict. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). Questions concerning the credibility of the witnesses and the weight and value to be given their testimony are matters entrusted to the trial judge as the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Accordingly, we may neither reweigh nor reevaluate the evidence. *Cabbage*, 571 S.W.2d at 835.

The arrest warrant charging Defendant with misdemeanor reckless endangerment indicated that the victim was the six-year old child who was a passenger in Defendant's vehicle. In order for there to be an "imminent" threat of death or serious bodily injury, the victim "must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). Clearly, the child victim was within the "zone of danger" as defined by our supreme court. *See id.* Taken in the light most favorable to the State, the proof showed that Defendant backed his vehicle from the Ceiga residence at a high rate of speed, ran a stop sign, proceeded at up to 80 miles per hour down Highway 51 North, attempted to force a police cruiser off the road and abruptly stopped, losing control of his vehicle when he knew, or should have known that he was in near proximity to two other vehicles. All of this occurred when Defendant knew he had a six-year-old child as a passenger. We conclude that the evidence was more than sufficient for any rational trier of fact to find the essential elements of misdemeanor reckless endangerment beyond a reasonable doubt.

### III. Sentencing

The trial court sentenced Defendant to serve 11 months and 29 days in the county jail with all but 30 days suspended. Defendant was sentenced following a hearing wherein he and his mother testified. Defendant argues on appeal that his entire sentence should be suspended.

A trial court is allowed greater flexibility in setting misdemeanor sentences than felony sentences. *State v. Humphreys*, 70 S.W.3d 752, 769 (Tenn. Crim. App. 2001). No separate sentencing hearing is required, though the court must give the defendant a reasonable opportunity to be heard regarding the length and manner of service of the sentence. Tenn. Code Ann. § 40-35-302(a) (1997 & Supp. 2002). There is no presumption of a minimum sentence. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999).

The sentence must be specific and in accordance with the principles, purposes, and goals of the Sentencing Act. Tenn. Code Ann. § 40-35-302(b) (1997 & Supp. 2002); *State v. Palmer*, 902 S.W.2d 391, 393 (Tenn. 1995). A determinate sentence should be set with a percentage of not greater than 75 percent to be served in confinement. Tenn. Code Ann. § 40-35-302(d) (1997 & Supp. 2002). The trial court should consider the enhancement and mitigating factors when calculating the percentage of the sentence to be served in confinement. *Id.*; *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). The trial court is authorized to place the misdemeanant on probation either immediately or after a term of confinement. Tenn. Code Ann. § 40-35-302(e) (1997 & Supp. 2002).

At the time of sentencing, Defendant had no prior criminal record, was 20 years old, and was not employed full time, but was a member of the Army National Guard. Defendant's mother testified that Defendant had tried to take care of her for the past two years due to her inability to work.

In sentencing Defendant, the trial court found that one enhancement factor applied, that the six-year-old child victim was particularly vulnerable because of his age. Tenn. Code Ann. § 40-35-114(5) (Supp.2002). Defendant had promised to take the child swimming. Defendant was agitated with the two police officers and with one or more other persons at the Ceiga residence. He placed the child into his vehicle and immediately initiated the course of conduct which led to his conviction.

Due to his age, the victim was unable to resist the crime and/or summon help. While this consideration might apply to *any* passenger no matter the age, an adult or at least an older minor passenger might be able to reason with Defendant or take control of the vehicle before it left the trailer park. Therefore, this enhancement factor is entitled to some, but little, weight. However, as noted above, the trial court is entitled to much more flexibility in misdemeanor sentencing than in felony sentencing. *Johnson*, 15 S.W.3d at 518. The misdemeanant is not presumptively entitled to the minimum sentence in the absence of enhancement factors. *Id.*

Defendant argues that he is entitled to have his entire sentence suspended because the trial court did not follow the considerations of Tennessee Code Annotated section 40-35-103(1) in ordering him to be confined in a jail for 30 days of the 11 months and 29 days sentence. These considerations are:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

Tenn. Code Ann. § 40-35-103(1) (1997).

However, when the trial court determines that total confinement during the sentence is not appropriate (as in this case), Tennessee Code Annotated section 40-35-103(5) is relevant in determining how much of the sentence should be served in confinement. *See State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). That section provides:

> The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence. . . .

Tenn. Code Ann. § 40-35-103(5) (1997).

The trial court specifically found that Defendant had "absolutely no remorse" and that Defendant was not truthful in his testimony. The trial court stated at the conclusion of the sentencing hearing that "[t]he Court further notes that the defendant, when he testified earlier, testified that everybody in the courtroom, except himself, was lying. I think it's the other way around, Mr. Dilling."

Lack of candor and lack of remorse show a lack of potential for rehabilitation and weigh against a totally suspended sentence. *Dowdy*, 894 S.W.2d at 306. The sentence imposed by the trial court was not inappropriate. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the reasons stated, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-7-